In re Shah H. NERCESSIAN, fdba SST Corp.; Leisure Time Travel International; Nerce Cosmetics, Inc., Debtor.

AIRLINES REPORTING
CORPORATION,
Plaintiff,

v.

Shah H. NERCESSIAN, fdba SST Corp.; Leisure Time Travel International; Nerce Cosmetics, Inc., Defendant.

Bankruptcy No. 685–07589–R7.
Adv. No. 685–6076–R.

United States Bankruptcy Court,
D. Oregon.

Dec. 16, 1986.

Michael W. Doyle, Perrin, Gartland & Doyle, Eugene, Or., for Airline Reporting Corp.

Larry Roloff, Eugene, Or., for Nercessian.

ALBERT E. RADCLIFFE, Bankruptcy Judge.

This is an adversary proceeding to determine the dischargeability of a debt under 11 U.S.C. 523. The debt is evidenced by a state court judgment that has been rendered in favor of plaintiff, against defendant. Plaintiff contends that the debt arises from fraud or defalcation while acting in a fiduciary capacity, embezzlement, larceny, or willful and malicious injury by the defendant to the plaintiff's property. Thus the debt is non-dischargeable under 11 U.S.C. 523(a)(4) & (6). Defendant denies any intentional wrongdoing.

Although plaintiff had taken the position, in the pre-trial order, that the state court judgment was binding on the issues presented in this case under the doctrines of res judicata and/or collateral estoppel, plaintiff conceded at trial that neither of these doctrines would have any application in this case.

Pursuant to a pre-trial stipulation, the court received the following documents into evidence at the trial herein:

1. The fourth amended complaint filed on behalf of plaintiff's predecessor in interest in the case of Air Traffic Conference of America v. Shah H. Nercessian, filed in the Circuit Court of the State of Oregon for the County of Lane, Case Number 16–81–06282 (the state court proceeding);

2. The transcript of the trial held in the state court proceeding on November 3, 1982 containing the testimony of Richard Sussmeier, assistant manager of the Financial Recovery Department for Air Traffic Conference of America and the debtor/defendant herein, Shah H. Nercessian;

3. The judgment entered in the state court proceedings signed by Circuit Court Judge Douglas R. Spencer on January 17, 1983;

4. The sales agency agreement between Air Traffic Conference of America and the defendant; and

5. The declaration of defendant entitled "Notice and Declaration of Shah Nercessian to Union Bank" dated February 7, 1979 and,

In addition, the court received, without objection, plaintiff's exhibit # 7, the affidavit of Robert Buchanan, the manager of the Financial Recovery Section of Air Traffic Conference of America, made in the state court proceeding and plaintiff's exhibit # 6, a summary of testimony summarizing the testimony of Richard Sussmeier and Shah Nercessian as more particularly set forth in the transcript of the state court trial.

Pursuant to the stipulation, the court then heard oral argument from counsel, determined that this adversary proceeding is a core proceeding as defined in 28 U.S.C. 157 and took this matter under advisement.

Certain facts are established by agreement of the parties as set forth in the pre-trial order, entered herein on March 20, 1986, as follows:

1. Plaintiff is a corporation organized under the laws of the state of Delaware and is the agent of all domestic and foreign airlines operating within the United States. Plaintiff is the successor in interest to Air Traffic Conference of America ("ATC"), an unincorporated trade association which was authorized by individual air carriers to enter into contracts with travel agencies, arrange for collection and payment of ticket obligations and otherwise act on behalf of the air carriers.

2. Defendant is the debtor in this Chapter 7 case.

3. On January 17, 1983, a judgment was rendered in favor of ATC against defendant in the state court proceeding. The judgment awarded plaintiff $189,682.28, together with costs against defendant.

In addition, the following uncontroverted facts were established by the evidence produced at trial:

4. Plaintiff is authorized by individual air carriers or airlines to collect monies owing to them and to conduct legal proceedings on their behalf. In addition, one of plaintiff's main functions is to oversee compliance with the standard sales agency agreement such as the one introduced into evidence at trial.

5. In 1974, plaintiff's predecessor, Air Traffic Conference of America (ATC) entered into the sales agency agreement that was received into evidence with Leisure World Travel, Inc., a Los Angeles based travel agency (travel agency), whereby certain air carriers agreed to issue airline ticket stock to the travel agency for the purpose of selling tickets, as an agent, for travel on said air carriers. Validator identification plates were also turned over to the travel agency, as agent, for the issuance of said tickets. On or about May 1, 1975, these parties entered into an amendment of the sales agency agreement whereby it was agreed that all monies collected by the travel agency, as agent, for air transportation services and tickets sold would remain the property of the individual air carriers and would be held in trust by the travel agency until satisfactorily accounted for to ATC.

6. Under the terms of the sales agency agreement, the travel agency was authorized to sell airline tickets, collect the proceeds therefrom and deposit the proceeds, less applicable commissions, into an area depository bank. The individual air carriers would then draw their respective share of the proceeds from this account.

7. In order to properly issue and document an airline ticket under the agreement, the travel agency needs, among other items, blank ticket stock, supplied by plaintiff and the appropriate air carriers' identification or validator plates. Plates are supplied by each airline, at its discretion, to the agency. When the agency issues a ticket, the applicable plate is embossed on a blank ticket stock.

8. Paragraph 4 of the sales agency agreement provides in pertinent part that:

"All ticket forms and exchange orders supplied by or on behalf of the Carrier to the Agent shall be held in trust by the Agent until issued to the Agent's clients to cover transportation purchased, or otherwise satisfactorily accounted for to the Carrier, or to the senior office of the ATA Economics and Finance Department or his designee, and will be surrendered upon demand, together with all airline identification plates, to the senior office of the ATA Economics and Finance Department or his designee, or his designated representative, acting pursuant to the Air Traffic Conference Agency Resolution....

The Carrier, may at its option, provide the Agent with one or more airline identification plate(s) for use in the issuance of tickets in said validator machine or ticket writer. such airline identification plates shall remain the property of the Carrier, and shall be returned to it upon demand or upon the termination of this agreement as between the Agent and the Carrier."

On the back of each of the plates is the statement "This is the property of (name of appropriate air carrier inserted here)" (parenthesis added).

9. Before an agency can be sold and the identification plates and blank ticket stock transferred to a buyer, proposed change of ownership forms listing the new buyer and other pertinent information must be submitted to the plaintiff and the new buyer must receive plaintiff's approval.

10. Plaintiff investigates the proposed buyer after change of ownership forms are received by plaintiff, and decides whether or not to grant approval. Final approval, if granted, usually comes ninety (90) to one hundred twenty (120) days after the proposed change of ownership forms are submitted. During the investigation period, plaintiff may grant temporary approval during which time the agency seller and buyer are jointly and severally liable for

any damages suffered by any air carrier under the sales agency agreement.

11. Defendant purchased the corporate stock of the travel agency for $113,000 in June, 1978. Proposed change of ownership forms were submitted and defendant took control of the travel agency. ATC gave defendant temporary approval on September 14, 1978.

12. By this time, defendant had decided to sell the agency and had reached an agreement with new buyers, the Suichs. On September 28, 1978, defendant wrote ATC asking for the necessary change of ownership forms.

13. The next day ATC sent the Suichs a mailgram notifying them that defendant could not sell the travel agency because he had not yet received final approval to buy it. The Suichs then notified defendant.

14. During this time, defendant found new buyers, the Minelians. On October 9, 1978, defendant transferred all of the travel agency's corporate stock to Jenevieve Minelian, who, the next day, transferred it to her father, Levon Minelian. They agreed to pay defendant $161,000 for the purchase of the agency; $89,000 as a cash down payment and the balance of $72,000 payable in ninety (90) days. Defendant turned over the blank ticket stock and airline identification plates on hand to the Minelians and they began to operate the business.

15. By letter dated November 6, 1978, defendant wrote ATC advising that the proposed sale (presumably to the Suichs) had been cancelled. There was no mention, in this letter, about the sale to the Minelians, which had already been consummated. According to the affidavit of Robert Buchanan, this letter was received by ATC on December 18, 1978.

16. From mid October to late November, 1978, defendant worked with the Minelians supervising the travel agency's operation. On November 20, 1978, defendant received his own final approval as the buyer of the travel agency. That same day he filled out change of ownership forms, list-ing the Minelians as the new owners, and gave the forms to the Minelians' attorney for submission to ATC. Shortly thereafter, defendant left Los Angeles and relinquished total control of the travel agency, including the blank ticket stock and airline identification plates to the Minelians.

17. In early January, 1979, defendant returned to Los Angeles to collect the balance due him from the Minelians on the purchase price of the travel agency.

18. On February 7, 1979, defendant signed the declaration entitled "Notice and Declaration of Shah Nercessian to Union Bank" that has been received into evidence in this case. The declaration recites in pertinent part as follows:

"This declaration gives notice that I Shah Nercessian claim any moneys on deposit with UNION BANK for the account of or utilized by SST Travel Corporation dba Leisure Travel International. . . .

In addition, Leisure Travel International conducts the business of a travel agency pursuant to Airline Regulatory Agency license appointments (from the ATC and IATA) in my personal name and for which I am personally liable. The funds in the accounts at the bank are utilized primarily to pay the airlines and agencies aforementioned for the airline tickets and related products sold by the business, Leisure Travel International. If Corporate funds are diverted or Corporate obligations to the airlines and regulatory agencies are not met then I, Shah Nercessian am personally responsible.

On the basis of my own personal knowledge and belief I, Shah Nercessian further state that the current operators Levon and/or Jenevieve Minelian or either of them have or have permitted their agents to divert funds and assets of the corporation to their own personal use in lieu of meeting corporate obligations for which I am personally liable. . . .

By this declaration you are hereby directed to refuse access to, delivery or payment of any funds, checks, notes or other instruments requiring payment of money by or from the SST TRAVEL CORPO-

RATION dba Leisure Travel International account 122000771300783752 by Levon or Jenevieve Minelian, their agents, attorneys, servants and employees and by any other person in whose name or for whose benefit the said account stands or is held with the exception that you are to continue to honor the prearranged drafts on the account for the benefit of the Air Traffic Conference (ATC) who shall continue to have a right to their funds from the account....

I declare under penalty of perjury that the foregoing is true and correct."

19. In late February, 1979, defendant filed suit for the balance of the purchase price due him. Shortly thereafter, he again left the Los Angeles area. Defendant received $35,000 in settlement resulting from the suit.

20. On March 2, 1979, defendant again wrote ATC asking for necessary change of ownership forms. With a letter dated April 1, 1979, the Minelians submitted to ATC the change of ownership application defendant had signed in November, 1978. According to the affidavit of Robert Buchanan, this was received by ATC on May 29, 1979. These forms reflected incorrect information concerning the travel agency's then current ownership and management.

21. On April 24, 1978, TWA Airlines informed ATC that the travel agency had failed to deposit ticket proceeds and was therefore declaring the travel agency in default of the sales agency agreement. This was ATC's first notice of any problems at the travel agency (affidavit of Robert Buchanan).

22. On May 7, 1979, ATC removed all of the blank stock and identification plates from the agency. ATC then conducted audits of the travel agency sales and discovered approximately $218,000 in unreported sales, most of which took place between March and May, 1979. ATC later received $28,000 from defendant's bond company, leaving a balance due of $189,682.28, the amount of the state court judgment.

23. According to the testimony of Richard Sussmeier and the affidavit of Robert Buchanan, ATC did not ever give any temporary or final approval for defendant to transfer the travel agency to any other party and the application form received by ATC on May 29, 1979, from the Minelians was never acted upon because the agency had already been declared to be in default of the sales agency agreement by TWA Airlines.

24. Defendant's Chapter 7 petition was filed herein on April 24, 1985.

The issues to be resolved by this court include the following:

1. Whether or not the actions of defendant, Shah Nercessian, were such that he has committed embezzlement of the plaintiff's property?

2. Whether or not the actions of defendant, Shah Nercessian, were such that he has committed a willful and malicious injury to the plaintiff's property?

3. Whether or not the actions of defendant, Shah Nercessian, were such that he has committed a fraud or defalcation while acting in a fiduciary capacity with the plaintiff?

The pertinent portions of 11 U.S.C. 523 relied upon by plaintiff are as follows:

"(a) A discharge under Section 727, ... of this title does not discharge an individual debtor from any debt ...

(4) for fraud or defalcation while acting in fiduciary capacity, embezzlement, or larceny; ...

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ..."

Defendant testified that in late November, 1978, he had contacted one of the plaintiff's representatives over the telephone and advised that the Minelians were the new owners of the travel agency. He further testified that he had been involved in four (4) previous travel agency transfers and that in each case, blank ticket stock and airline identification plates were transferred and the buyer took control of the agency before receiving temporary or final approval from the plaintiff or its predeces-

sor, ATC. He, therefore, maintains that this is an industry custom. Defendant testified that he was not personally aware of the contents of the declaration he signed dated February 7, 1979, requesting the Union Bank to freeze the travel agency's account. He testified that he simply signed that document at the request of his California attorney without reading it. Defendant maintains that, at most, his conduct amounts to negligence and a breach of contract. Accordingly, the debt owing to plaintiff, as evidenced by the state court judgment, is dischargeable in bankruptcy.

"Regardless of whether or not a fiduciary relation is found, section 523(a)(4) of the Code would deny discharge of a debt resulting from the debtor's embezzlement or larceny of funds." *Great American Insurance Company v. Storms (In re Storms)*, 28 B.R. 761, 764, (Bankr.E.D.N.C. 1983). Embezzlement has been defined as an intentional misappropriation of money or property of another that has been lawfully received, but knowingly and wrongfully misused by the "embezzler". *Central Investors Real Estate Corp. v. Powell (In re Powell)*, 54 B.R. 123 (Bankr.D.Or. 1983), *Great American Insurance Company v. Storms (In re Storms), supra.*, *Air Traffic Conference of America v. Chick (In re Chick)*, 53 B.R. 697, 703 (Bankr.D. Or.1985). The property converted or misued need not always be cash or cash equivalents. *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202 (Bankr.M.D.Tenn. 1982).

In this case, it appears that the defendant came into possession of the blank ticket stock and airline identification plates lawfully. Does his transfer of the ticket stock and identification plates to the Minelians without the prior approval of the plaintiff or appropriate airlines, constitute a knowing and wrongful misuse or conversion on his part?

It is true that the defendant testified that, based upon his experience, it is a custom in the travel industry for the seller of a travel agency to transfer control of the agency to a buyer prior to receiving either temporary or permanent approval from plaintiff. Further, defendant testified that he informed one of plaintiff's representatives over the telephone in late November, 1978 that the Minelians were the new owners. Defendant, however, produced no notation, letter of confirmation or any other evidence of this telephone call. He could not identify the representative he spoke with. Defendant admits to sending his letter dated November 6, 1978 to plaintiff indicating that a proposed sale of his travel agency to the Suichs had been cancelled.

According to the affidavit of Robert Buchanan and the testimony of Richard Sussmeier, plaintiff believed that the defendant remained the owner and in control of the travel agency. Plaintiff had no notice that the agency had been transferred to the Minelians. Indeed, Mr. Sussmeier testified that, in his opinion, at the time the airline identification plates and ticket stock were removed from the travel agency in May, 1979, the defendant was still the legal owner of the travel agency.

Plaintiff maintains that it has a strong interest in approving those persons who will have possession and control of blank ticket stock and airline identification plates since possession of such items enables those in possession to, essentially, print money. This contention is borne out by the facts in this case where the Minelians were able to sell airline tickets to their customers and, by failing to report the sales, retain approximately $218,000 in funds which should have been transmitted to the appropriate airlines. Mr. Sussmeier testified that plaintiff would investigate the proposed new owner of a travel agency when a change of ownership application is submitted. It is clear to this court, from Mr. Sussmeier's testimony, that approval is not automatic.

Defendant argues that if any conversion or embezzlement occurred, there was no intentional wrongdoing on his part as he received no benefit from any such embezzlement or conversion. This argument clearly lacks merit. The sale of the travel agency by defendant to the Minelians en-

abled the defendant to receive approximately $124,000 in sale proceeds.

Defendant contends, as stated above, that, at most, his actions in transferring the ticket stock and identification plates to the Minelians amounts to no more than a breach of contract or simple negligence. In support of this contention, defendant points out that no punitive damages were awarded in the state court judgment.

This court will not speculate on the state court's rationale in its decision concerning punitive damages and the judgment itself is silent in that regard. This court finds that defendant misled the plaintiff with his letter to the plaintiff dated November 6, 1978.

As a further indication of the defendant's intentions in this case, the "Notice and Declaration of Shah Nercessian to Union Bank" is significant. In this document of February, 1979, defendant declared, that on his own personal knowledge and belief, he believed that the Minelians were diverting funds and assets to their own personal use in lieu of making payment to the appropriate airlines. Although he attempts, by his testimony, to negate the importance of this document, he testified that he did have suspicions. Specifically, he suspected that Jenevieve Minelian had a drug problem and that she might divert funds to support her habit. Defendant admits, in his testimony, that he never contacted the plaintiff about these suspicions.

This court finds that defendant's testimony lacks credibility. Specifically, this court finds that no notice of the transfer of the blank ticket stock and identification plates from the defendant to the Minelians was ever given to ATC by defendant and that defendant's testimony concerning industry custom should not be given any weight, considering the testimony and evidence offered by plaintiff. This court adopts the plaintiff's version of the facts in this case where there is a disagreement as to the facts.

This court finds that defendant knowingly and wrongfully misused and converted the blank ticket stock and airline identifica-

tion plates that had been entrusted to him by the plaintiff and various air carriers. It follows that defendant has committed an embezzlement which renders his debt to the plaintiff, as evidenced by the state court judgment, non-dischargeable in bankruptcy pursuant to 11 U.S.C. 523(a)(4).

■ In the alternative, this court finds that defendant has committed willful and malicious injury to the property of the plaintiff which renders his debt to plaintiff non-dischargeable pursuant to 11 U.S.C. 523(a)(6). The Ninth Circuit Court of Appeals has recently defined the term "willful and malicious" as follows:

> When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is willful and malicious even absent proof of a specific intent to injure. *In re Cecchini*, 780 F.2d 1440, 1443 (9th Cir. 1986).

Although defendant may have had no specific intent to cause injury to the plaintiff, under the definition of "willful and malicious" as set forth above and for the reasons stated in this opinion, this court finds that defendant's actions constitute a willful and malicious injury to the plaintiff's property.

■ The state court found that defendant had breached a fiduciary duty owed to the plaintiff and the existence of such a fiduciary obligation was admitted by defendant. In light of this court's findings as to embezzlement and willful and malicious injury, however, this court will not address that issue.

Finally, defendant argues that his acts did not cause any injury to the plaintiff as most of the unreported sales occurred between March and May, 1979, long after he had relinquished control of the travel agency.

It was, however, defendant's transfer of the blank ticket stock and identification plates that enabled the Minelians to cause the injury which occurred in this case. Without these items, the Minelians would

not have been able to print tickets, collect and convert monies.

Defendant gave the Minelians the means to commit fraud. He did not notify the plaintiff of the transfer of the blank ticket stock and identification plates to the Minelians. Indeed he misled plaintiff into the assumption that defendant was still the owner/operator of the travel agency.

Plaintiff did not become aware that the Minelians had control of the ticket stock and plates until the damage had already occurred. Plaintiff acted promptly to protect its rights when it became aware of problems existing at the travel agency.

The state court found satisfactory causation to enter its judgment. Based upon an independent examination of the evidence in this case, this court agrees.

This Opinion shall constitute findings of fact and conclusions of law under Federal Rule of Civil Procedure 52 as made applicable to this court by Bankruptcy Rule 7052, they shall not be separately stated. A judgment consistent hereiwth shall be entered.